UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

FASHION SHOP LLC,

                    Plaintiff,              06 Civ. 2203

        -against-                           O P I N I O N

VIRTUAL SALES GROUP CORP., TD
BANKNORTH INC. and John Does 1-10,

                    Defendants.

----------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11 30 07

A P P E A R A N C E S:

        ATTORNEYS FOR PLAINTIFF

        BALLON STOLL BADER & NADLER, P.C.
        1450 Broadway, 14th Floor
        New York, NY 10018-2268
        BY: VANO HAROUTHUNIAN, ESQ.


        ATTORNEYS FOR DEFENDANT VIRTUAL SALES GROUP

        LESTER SCHWAB KATZ & DWYER, LLP
        120 Broadway, 38th Floor
        New York, NY 10271
        BY: THOMAS A. CATALANO, ESQ.

        ATTORNEYS FOR DEFENDANT TD BANKNORTH INC.

        PHILLIPS LYTLE, LLP
        437 Madison Avenue.
        New York, NY 10022
        BY: MICHAEL C. FOLEY, ESQ.

**Sweet, D.J.**

All parties to this action have made dueling motions for summary judgment pursuant to Rule 56, Fed. R. Civ. P. The action arises out of a failed international transaction involving the sale of goods alleged to be valued at $489,113.98. Upon the facts and conclusions set forth below, the motion of defendant TD Banknorth, N.A. ("Banknorth") for judgment dismissing the complaint of plaintiff, Fashion Shop, LLC ("Fashion Shop") is granted, the motion of defendant Virtual Sales Group Corp. ("VSG") for a judgment dismissing the complaint of Fashion Shop is granted, the cross claim of Banknorth against VSG is dismissed, the relief sought by VSG in its counterclaim is granted, and the motion by Fashion Shop for summary judgment against VSG is denied.

## The Parties

Fashion Shop is a corporation organized and existing under the laws of Dubai, United Arab Emirates, and is engaged in the business of manufacturing and selling apparel to retail and distribution outlets.

VSG is a corporation organized and existing under the laws of Maine and is engaged in sales and distribution of products

1

at wholesale. VSG maintains an office and showroom at 314 Fifth Avenue, New York, New York.

Banknorth, a national bank association, is a Delaware corporation, a successor by merger to Peoples Heritage Bank ("Peoples Bank"), with its principal office in Portland, Maine.

## Prior Proceedings

Fashion Shop filed its complaint on March 21, 2006 seeking to recover $489,313.98 for apparel goods sold to VSG and for fraud and negligence committed by Peoples Bank. Discovery has proceeded.

The instant motions were heard and marked fully submitted on April 25, 2007.

## The Facts

Banknorth and Fashion Shop have not submitted Local Rule 56.1 Statements but rather affidavits in support of this motion, a procedural default which has complicated the factual findings which follow. However, the facts set forth below are derived from those affidavits and the Local Rule 56.1 Statement of VSG and the Counter

2

Statement[1] of Fashion Shop and are not in dispute except as noted.

VSG is a distributor and developer of home decor products, including carpets, textiles, bed and bath items, among other goods, with a principal place of business in Scarborough, Maine. About 45% to 50% of its business is as a supplier to the Home Shopping Network ("HSN"), a major cable television retailer.

In January, 2004, VSG was introduced to Ziad Matar ("Matar"), a principal of Gemini Ready Made Textiles ("Gemini"), located in Cairo, Egypt, alleged to be Fashion Shop's assignor (Compl. ¶ 10). Matar is also a principal of Fashion Shop.

Through a series of purchase orders, Gemini agreed to sell sheet and pillowcase sets to HSN, through VSG. The sheets were to be made from 100% Egyptian cotton, and manufactured in Egypt. HSN was to be the importer of record. The purchase orders would be financed by letters of credit, opened by HSN. Upon

---

[1] Fashion Shop's Counter Statement is without record references in violation of Local Civil Rule 56.1. See Lee v. Marvel Enters., Inc., 386 F. Supp. 2d 235, 244-45 (S.D.N.Y. 2005); Loucar v. Boston Mkt. Corp., 294 F. Supp. 2d 472, 478 (S.D.N.Y. 2003).

3

receipt of the purchase price from HSN, Fashion Shop was to pay VSG a percentage commission.

The first two shipments were for 500-thread count and 600-thread count sheets sent from Alexandria, Egypt, in October and November 2004, which were accepted by HSN. Although the shipments were late and the quantities were less than the contract required, the quality of the product was satisfactory, and HSN placed a large order for 300-thread count sheets, in a two-pack consisting of one solid sheet set and one printed sheet set in the same color (the "Two-Pack Order").

For the Two-Pack Order, Fashion Shop determined that the shipments were to come from Dubai instead of Egypt. HSN would not issue a letter of credit to Dubai, and its letters of credit to Egypt were not transferable. VSG therefore became the importer of record instead of HSN. Upon delivery and acceptance in the United States, VSG would sell the goods to HSN as a domestic sale, HSN would inspect the goods, HSN would pay VSG, which in turn would pay Fashion Shop within ten days after acceptance by HSN.

It was agreed that VSG would make a down payment to Gemini of $250,000. The balance would be due after the goods were delivered to and accepted by VSG. On January 16, 2005, Matar

4

emailed VSG confirming the terms of the agreement: "my partner agred [sic] to ship this goods per your E mail if you pay up front $250000,00 $ as promised and balance net 15 day after delivery to HSN ware house this must be in full amount[.]" (Catalano Decl., Ex. F, at 000092.)

VSG confirmed that it would pay a $250,000 down payment with the balance to be paid "upon 10 days rog [receipt of goods] from HSN." (Id. at 000091.) After the $250,000 down payment was made, the funds were to be available for future orders. (Id. at 000092.)

Fashion Shop knew that the goods were subject to acceptance by HSN. Concerned that the goods could be late in shipping, Matar noted "WE RISK REFUSAL OF ACCEPTANCE FROM HSN AFTER BARRING [sic] ALL THIS EXPENCES." (Id. at 000090.) Matar explained this email at his deposition: "[T]hese goods have been manufactured for HSN, and it was supposed to be delivered to HSN. So, I'm just trying to make it clear that they have to clear it and deliver it to HSN as quick as possible." Matar Tr. at 83.

On February 8, 2005, on behalf of Fashion Shop, the Dubai branch of Habib Bank AG Zurich ("Habib Bank") issued and sent to Banknorth a letter of instruction dated February 8, 2005 (the

5

"February 8 Instruction Letter") which enclosed the following documents for collection "subject to" and "to be executed in accordance with the Uniform rules for Collection Publication No. 522 (URC 522) of the International Chamber of Commerce" ("URC 522"):

(a) A Bill of Exchange identified with reference no. 2525/08022005 in the amount of $250,000.00, payable at sight, drawn by Fashion Shop against the defendant VSG (the "Sight Bill of Exchange");

(b) A commercial invoice for 731 cartons of sheet sets and pillowcases;

(c) An air waybill issued by EgyptAir;

(d) A packing list describing the contents of 731 cartons of sheet sets and pillowcases from Gemini to VSG;

(e) A Beneficiary's Certificate describing the 731 cartons of sheet sets and pillowcases;

(f) A Country of Origin Declaration describing the 731 cartons of sheet sets and pillowcases;

(g) A certificate of Origin describing the 731 cartons of sheet sets and pillowcases;

(h) A Bill of Exchange identified with reference no. 1616/08022005 in the amount of $214,924.03, payable at 15 days sight, drawn by Fashion Shop against VSG (the "15 Day Bill of Exchange");

(i) A commercial invoice no. 003/2005 for 1609 cartons of sheet sets and pillowcases;

(j) An air waybill issued by British Airways;

(k) three packing lists describing the contents of 1611 cartons of sheet sets and pillowcases from Gemini to VSG;

(l) A Beneficiary's Certificate describing the 1611 cartons of sheet sets and pillowcases;

(m) A Country of Origin Declaration describing the 1611 cartons of sheet sets and pillowcases; and

(n) A Certificate of Origin describing the sheet sets and

pillowcases included in invoice no. 003/2005.

On February 11, 2007, Banknorth's third party vendor sent the VSG broker an Air Release, asking for the release of the 741 cartons described in the February 8 Documents.

On February 14, 2008, Banknorth paid the Sight Bill of Exchange by wiring the sum of $250,000 to Habib Bank for the credit of Fashion Shop, and debiting VSG for the amount of the wire, plus fees.

On February 14, 2005, Habib Bank issued and sent to Banknorth a second letter of instruction dated February 14, 2005 (the "February 14 Instruction Letter") enclosing the following documents for collection "subject to" and "to be executed in accordance with the Uniform rules for Collection Publication No. 522 (URC522) of the International Chamber of Commerce" (the "February 14 Documents"):

(a)  A Bill of Exchange identified with reference no. 005/2005 in the amount of $274,189.95, payable at ten days on a documents upon acceptance ("D/A") basis, drawn by Fashion Shop against VSG (the "10 Day Bill of Exchange");

8

(b) A commercial invoice no. 005/2005 for 1067 cartons of sheet sets and pillowcases;

(c) An air waybill issued by British Airways;

(d) Three packing lists describing the contents of 1067 cartons of sheet sets and pillowcases from Gemini Ready Made Garments and Textiles to VSG;

(e) A Beneficiary's Certificate describing the 1067 cartons of sheet sets and pillowcases;

(f) A Country of Origin Declaration describing the 1067 cartons of sheets sets and pillowcases; and

(g) A certificate of Origin describing the 1067 cartons of sheet sets and pillowcases.

Alison Garrison ("Garrison"), a Vice President of VSG, signed the 10 Day Bill of Exchange, and the Sight Bill of Exchange that had already been paid on sight, but did not sign the 15 Day Bill of Exchange, and she returned the three bills of exchange either to Banknorth or to Banknorth's third party vendor.

9

On February 17, 2005, Banknorth's third party vendor sent the VSG broker two air releases asking for the release of the remaining goods described in the February 8 Documents and the goods described in the February 14, 2005 Documents.

The goods described in the February 8 Documents and the February 14 Documents were inspected by Pro QC International, a quality control company, and rejected as being defective and not conforming to the agreed specifications.

Garrison advised Banknorth that VSG was refusing to pay the 15 Day Bill of Exchange and the 10 day Bill of Exchange because the goods were defective. VSG also advised Banknorth's third party vendor that, because it had rejected the goods, VSG was not going to pay either the 15 day Bill of Exchange or the 10 Day Bill of Exchange. Banknorth's third party vendor subsequently advised Habib Bank by SWIFT message that VSG had refused payment of the accepted Bills of Exchange and closed its file.

VSG informed Fashion Shop that the goods were rejected, and demanded return of its $250,000 down payment and reimbursement of its expenses. Fashion Shop agreed under certain conditions to return VSG's $250,000 down payment and to reimburse it for its expenses, requesting six working days (until March 17, 2005) to

obtain a better sale price for the defective goods. (Catalano Decl., Exs. N, O, Q.)

VSG gave Fashion Shop additional time after March 17, 2005, but Fashion Shop refused to return VSG's $250,000 down payment or reimburse VSG for its expenses. Fashion Shop attributed this situation to its factory manager, Kiran Pancual. (Catalano Decl., Ex. T).

VSG was unable to sell the goods to discount outlets, but sold them instead for salvage, realizing $282,132 upon liquidation of the goods. VSG had incurred a total of $335,102.36 in out-of-pocket expenses, inclusive of the $250,000 deposit, resulting in a net loss of $52,970.36 in out-of-pocket expenses. (Catalano Decl., Ex. U.)

## The Summary Judgment Standard

In deciding a motion for summary judgment, a court shall render judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp.

11

v. Catrett, 477 U.S. 317, 322 (1986); Weinstock v. Columbia Univ.,
224 F.3d 33, 41 (2d Cir. 2000).

The moving party has the initial burden of showing that
there are no material facts in dispute, Adickes v. S.H. Kress &
Co., 398 U.S. 144, 157 (1970), and can discharge this burden by
demonstrating that there is an absence of evidence to support the
nonmoving party's case, Celotex, 477 U.S. at 325. The nonmoving
party then must come forward with "specific facts showing that
there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to
every element "essential to that party's case, and on which that
party will bear the burden of proof at trial." Celotex, 477 U.S.
at 322.

The court "must resolve all ambiguities and draw all
reasonable inferences in favor of the party defending against the
motion." Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d
Cir. 1985). However, the court must inquire whether "there is
sufficient evidence favoring the nonmoving party for a jury to
return a verdict for that party." Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 249 (1986). If there is not, summary judgment is
proper. See id. at 249-50.

12

## The Banknorth Summary Judgment Motion is Granted

The two Instruction Letters directed Banknorth to present the Bills of Exchange to VSG for acceptance or payment, depending on the terms of the Instruction Letters and the Bills of Exchange. In the case of the Sight Bill of Exchange, Banknorth was instructed to release the Documents upon payment, which it did.  When VSG instructed it to wire $250,000 to Fashion Shop, it wired the funds, and asked the carrier to release 741 cartons of Goods to VSG's broker.  Banknorth's instructions with respect to the two remaining Bills of Exchange were to release the documents upon acceptance.

Banknorth obtained the requisite acceptance of the 10 Day Bill of Exchange.  Garrison testified on behalf of VSG that she reviewed the Documents, that they "looked fine paperwise," and that they appeared to conform to the payment terms agreed upon between VSG and Fashion Shop.  (Garrison Tr., at 82).  She signed the 10 Day Bill of Exchange and sent it to Banknorth or ABN Amro Bank N.V. ("ABN"), Banknorth's outsource provider, in order to obtain a release of the goods.  ABN issued the appropriate Air Release for 1067 cartons of the goods.

While Garrison apparently failed to sign the 15 Day Bill of Exchange, VSG has stated that it accepted the Bills of Exchange

13

on the understanding that the goods were of the nature and quality that were described in the Documents. Specifically, in response to a request that it admit that "[t]he DA Documents were not accepted by VSG", VSG responded: "Denied. VSG accepted the DA Documents as they purported to indicate that the goods conforming to those ordered by VSG had been shipped." (Foley Aff., Ex. F).

VSG's response is consistent with Garrison's testimony: She testified that she signed the necessary documents to obtain the goods, that the terms were generally consistent with her understanding, and that she knew she had to "sign off" to get the goods released. (Garrison Tr. at 81, 92, 93, 94, 114, 116, 117).

Since VSG accepted the 10 Day Bill of Exchange and the 15 Day Bill of Exchange, Banknorth properly released the Documents accompanying those drafts as well.

The February 8 Instruction Letter, which transmitted the 15 Day Bill of Exchange to Banknorth, specifically provided that the collection of the Documents was "subject to" and "to be executed in accordance with the Uniform Rules for Collection Publication No. 522 of the International Chamber of Commerce." Article 9 of URC 522 provides that "[b]anks will act in good faith and exercise reasonable care." Although URC 522 does not address

14

the consequences of a bank's failure to use such care, a party claiming a breach of that duty must prove that the breach was the proximate cause of its injury. See North Am. Stainless v. PNC Bank Kentucky, Inc., No. 99-5730, 2000 U.S. App. LEXIS 17925, at *10-11 (6th Cir. July 13, 2000).

Here, VSG refused to pay the D/A drafts because it alleged the goods were defective and failed to conform to their specifications. There is no evidence that VSG's refusal to pay the D/A Drafts was based on Garrison's failure to sign the 15 Day Bill of Exchange.

The evidence has established that VSG intended to accept all three Bills of Exchange, executed and paid the Sight Bill of Exchange, executed an acceptance of the 10 Day Bill of Exchange, and intended to execute an acceptance of the 15 Day Bill of Exchange but inadvertently failed to do so. No evidence to the contrary has been submitted.

No evidence has been submitted to establish that Banknorth's failure to obtain a signature on the 15 Day Bill of Exchange played any role in the refusal of VSG to pay the drafts when due. Under the circumstances, Fashion Shop cannot prove that its damages were proximately caused by any act or omission by

15

Banknorth. See North Am. Stainless, 2000 U.S. App. LEXIS 17925, at *10-11.

Although in its Complaint and motion for summary judgment Fashion Shop claimed that Banknorth is liable to Plaintiff for $489,113.03 (the face amount of the 15 Day Bill of Exchange and the 10 Day Bill of Exchange) because it released goods to VSG without obtaining VSG's execution of the collection documents, in its opposition Fashion Shop appeared to have discarded its initial contention, instead arguing that Banknorth had a duty to pay the two Bills of Exchange once they had been accepted by VSG. As Fashion Shop has put it, "the very language of the 'accepted' Bills of Exchange . . . represents a clear, irrevocable instruction . . . to the bank to 'Pay to Habib Bank AG Zurich or Order the sum of USD $214,924.03' . . . and 'Pay to Habib Bank AG Zurich or Order the sum of USD $274,189.95 . . .' totaling the principal sum of $489,113.98 for which the court should grant summary judgment against the Bank." (Matar Reply Aff. ¶ 8; Pl. Reply Mem. at 4).

On their face, the Bills of Exchange are drafts, drawn by Fashion Shop (the "drawer") on VSG (the "drawee"), on Banknorth or any other bank. No account is identified. When a draft accompanied by commercial documents is sent to a bank for collection, that bank (a "collecting bank") is obligated to present

16

it to the drawee. If it is payable at sight, the documents accompanying it will be released when it is paid. If it is a D/A draft, the documents will be released when it is accepted. Acceptance of a bill of exchange drawn on a non-bank drawee does not authorize the collecting bank to pay the item when it becomes due. Instead, acceptance obligates the drawee to pay the drawer on that date. If the drawee refuses to pay, then it is up to the drawer to take appropriate action to collect the amount due. See New York. U.C.C. § 4-501.

The February 8 Letter of Instruction directed Banknorth to release documents against payment of the enclosed Sight Bill of Exchange and to release documents against acceptance of the enclosed 15 Day Bill of Exchange. The February 14 Letter of Instruction directed Banknorth to release Documents against acceptance of the enclosed 10 Day Bill of Exchange. Neither Letter of Instruction directed Banknorth to prepare or obtain a bank draft or other instrument in addition to payment or acceptance of the Bills of Exchange, which the Letters of Instruction could have done under Article 8 of URC 522.

The court in Whitehall Packing Co., Inc. v. First Nat'l City Bank, 55 A.D.2d 675 (N.Y. App. Div. 1976) noted the differing obligations of a payor bank under a check and a collecting bank

17

under a draft. In Whitehall, the plaintiff claimed that the instruments in question were checks, and therefore the defendant bank was liable for failing to pay them according to their terms. The bank argued that the instruments were documentary drafts. The court affirmed the lower court's decision, holding that the drafts were documentary drafts, and not checks. Therefore, the bank was not liable as a payor bank, but instead its obligations were those of a collecting bank: "to exercise ordinary care in presenting the draft for payment." Id. at 676-77.

None of the cases cited by Fashion Shop stands for the proposition that a bank is obligated to pay an accepted draft drawn on a third party. Fashion Shop's Reply Memorandum cites to several cases that define what constitutes "acceptance," but none of them imposes any duty on a bank to pay third party drafts.

Nor does URC 522 impose such an obligation. Article 2 of URC 522 defines "collection" in this context to consist of "handling [financial documents and commercial documents] in accordance with instructions received in order to . . . deliver documents against payment and/or against acceptance."

Article 6 of URC 522 explicitly describes the obligations of a collecting bank as part of the documentary collections

18

process:

> In the case of documents payable at sight the
> presenting bank must make presentation for
> payment without delay. In the case of
> documents payable at a tenor other than sight
> the presenting bank must, where acceptance is
> called for, make presentation for acceptance
> without delay, and where payment is called
> for, make presentation for payment not later
> than the appropriate maturity date.

Banknorth's obligations were to present the Bills of
Exchange to VSG and to release the Documents on payment (in the
case of the Sight Bill of Exchange) or acceptance (in the case of
the 15 Day and the 10 Day Bills of Exchange). Banknorth fulfilled
these requirements.

Fashion Shop has contended that Banknorth's handling of
the Sight Bill of Exchange established a customary procedure of
paying Bills of Exchange like those involved in this case.
However, Banknorth Vice President Catriona Kent Sheehan ("Sheehan")
did not testify as to any "customary procedure" on the part of
Banknorth, but only about this particular transaction, and
specifically stated that VSG authorized the payment of the Sight
Draft from its account. (Sheehan Aff. ¶ 7). Only in that context
did she go on to describe the mechanics of the payment process:

On or about February 14, 2007, Banknorth paid
the Sight Bill of Exchange by wiring the sum
of $250,000 to Habib Bank for the credit of
Fashion Shop, and debiting Virtual Sales for
the amount of the wire, plus fees.

(Sheehan Aff. ¶ 9).

This recital does not constitute evidence that Banknorth
customarily paid Bills of Exchange drawn on third parties without
authorization or the funds available from which to make the
payment.

The Instruction Letters and the D/A Bills of Exchange
directed Banknorth to release the goods to VSG upon the acceptance
of the two Bills of Exchange. Payment was not due on each Bill of
Exchange until fifteen and ten days thereafter, respectively. VSG
informed Banknorth that it was refusing to pay the accepted Bills
of Exchange on or about the day they were due.

Further, Fashion Shop cannot reasonably claim that it
lacked actual knowledge of the status of the Bills of Exchange.
Matar was advised immediately when the goods were rejected and that
VSG had refused to pay for them, and he also knew (at least by
March 9, 2005) that VSG had signed the Bills of Exchange.
(Catalano Decl., Exs. K, Q).

20

VSG and Fashion Shop continued to negotiate regarding the return of the goods after the Bills of Exchange became due, and the goods were not finally liquidated by VSG until August, 2005. (Catalano Decl., Exs. Q, R, S, T, U).

Fashion Shop's opposition to Banknorth's motion fails to raise any material issues of fact that would preclude summary judgment in favor of Banknorth.

## The Claim for Fraud is Dismissed

The Complaint alleges that VSG's acceptance of its bills of exchange "irrevocably confirm[ed] VSG's irrevocable commitments to pay the invoiced amounts to plaintiff and its assignor Gemini[.]" (Compl. ¶ 14). It also alleges that VSG, by obtaining the goods without payment of the invoices, committed a fraud. (Compl. ¶ 15).

There is no evidence to establish that VSG made an "irrevocable commitment" to pay regardless of how defective or nonconforming the goods may have been. This was a D/A transaction. VSG accepted the bill of exchange in exchange for obtaining possession of the goods, with the shipper extending credit to VSG for ten days after acceptance by HSN. The goods failed inspection

21

and VSG rejected them.

Furthermore, Fashion Shop has failed to adduce evidence supporting a claim of fraud. To maintain an action for fraud, a plaintiff must demonstrate that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the defendant thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Bridgestone/Firestone v. Recovery Credit Servs., 98 F.3d 13, 19 (2d Cir. 1996) (citation omitted).

A fraud claim cannot be based upon a breach of contract unless it is premised upon "a legal duty separate from the duty to perform under the contract" or "a fraudulent misrepresentation collateral or extraneous to the contract." Id. at 20; see also McKernin v. Fanny Farmer Candy Shops, 574 N.Y.S.2d 58, 60 (N.Y. App. Div. 1991) ("It is well settled that where, as here, a claim to recover damages for fraud is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie.").

Here, Fashion Shop has not pointed to any part of the

record supporting a separate legal duty VSG owed Fashion Shop or a fraudulent misrepresentation outside of the bounds of the contract. Accordingly, the fraud claim must be dismissed.

## The Banknorth Cross-Claim Against VSG is Dismissed

Even if Banknorth were liable to plaintiff based upon its improper handling of the transaction documents, then it would have been solely as a result of its own acts or omissions, or violation of international banking customs, regulations, or rules, and not on account of any wrongdoing on the part of VSG.

Moreover, the allegations in the cross-claims are unsupported by evidence. The first cross-claim alleges that VSG designated Banknorth as the consignee of the air waybills without Banknorth's consent and contrary to its express written instruction. However, no evidence has been presented that VSG caused Banknorth to be named as a consignee of the air waybills. The air waybills were prepared by Fashion Shop, as the shipper, without any instruction or intervention by VSG. (Garrison Tr. at 83-85).

Banknorth's second cross claim is for contribution against VSG for its "proportionate share of responsibility as is

23

adjudged between the defendants."

Contribution is not, however, available in a breach of
contract action. "New York law does not permit a party to seek
contribution when the underlying liability is for breach of
contract." General Conference of Seventh-Day Adventists v. AON
Reinsurance Agency, Inc., 860 F.Supp. 983, 989 (S.D.N.Y. 1994)
(citing Board of Educ. v. Sargent, Webster, Crenshaw & Folley, 71
N.Y.2d 21 (1987)).

While Banknorth has characterized this as a tort action,
the doctrine of contribution does not apply to cases brought under
the Uniform Commercial Code. See Putnam Rolling Ladder Co., Inc.
v. Mfrs. Hanover Trust Co., 74 N.Y.2d 340, 348 (1989) ("The
importation of comparative negligence into the UCC . . . has
generally been rejected by both courts and commentators. We
agree."); Five Towns Coll. v. Citibank, N.A., 489 N.Y.S.2d 338, 345
(N.Y. App. Div. 1985) ("The concept of comparative fault is [not] a
permissible vehicle to vary the respective rights and obligations
under the UCC of the parties to a negotiable instrument."). URC
522, similarly to the UCC, represents a "distillation of a
painstaking process of evolution, pursuant to which the risk of
loss in commercial matters has been attempted to be adjusted in a
fair and equitable manner," which will not be disturbed by this

24

Court. Five Towns Coll., 489 N.Y.S.2d at 345.

Even assuming that the doctrine of contribution applied to this breach of contract action, there could still be no viable cross-claim against VSG since there is no evidence that VSG is liable to Fashion Shop, or that VSG owed a duty to Fashion Shop that it breached. "The critical requirement for a contribution claim under New York law is that the breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought." McCoy v. Goldberg, 883 F.Supp. 927, 933 (S.D.N.Y. 1995) (quoting Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp., 71 N.Y.2d 599, 528 N.Y.S.2d 516, 518 (1988)) (internal quotation marks omitted).

## **VSG is Entitled to the Relief Sought by its Counterclaims**

On May 26, 2006, VSG filed its Answer and counterclaims. Fed. R. Civ. P. 12(a)(2) provides in pertinent part that a plaintiff "shall serve a reply to a counterclaim in the answer within 20 days after service of the answer." Fashion Shop never served a reply to VSG's counterclaims. Therefore, VSG is entitled to judgment on the counterclaims on default.

Additionally, none of the pro forma denials in Fashion Shop's

25

Rule 56.1 Counter-Statement is "followed by citation to evidence which would be admissible." Local Civ. R. 56.1(d). The Court may accordingly deem VSG's Rule 56.1 statements admitted. See Lee, 386 F. Supp. 2d at 244-45; Loucar, 294 F. Supp. 2d at 478; Gadsden v. Jones Lang Lasalle Ams., Inc., 210 F. Supp. 2d 430, 438 (S.D.N.Y. 2002).

In Statement Nos. 1, 3 and 4, VSG states, among other things, that the goods were subject to inspection by HSN upon delivery. In response to VSG Statement No. 1, Fashion Shop denies that the goods were subject to inspection, but in its response to Statement No. 4 Fashion Shop conceded that it "knew that HSN would be inspecting the goods and had to meet specifications." This apparent attempt at drawing a distinction is unavailing.

In response to VSG Statement No. 5, Fashion Shop admitted that the pre-shipment inspection was cancelled, but denied that it refused to permit the pre-shipment inspection to take place. Its position is refuted by the letter from its factory canceling the pre-shipment inspection upon the orders of Matar.

VSG Statement Nos. 6 through 25 specifically delineated all of the defects found in the goods as determined by an independent inspector. In response to each of these Statements

26

plaintiff stated only: "This statement merely reflects defendant VSG's position and it is not admitted by the Plaintiff." Fashion Shop has offered no evidence to contradict even one of these twenty statements. The product defects identified by the VSG statements, as supported by the deposition of inspector Frank D'Amato and his inspection report, are deemed admitted.

VSG Statement No. 26 alleges that VSG immediately informed plaintiff that the goods were defective. Fashion Shop has admitted this allegation, although it took issue with the word "immediately." In VSG Statement Nos. 27 through 34, VSG demonstrated that Fashion Shop failed to take back the goods or return VSG's $250,000 deposit and reimburse its expenses; that the goods had to be sold for salvage due to their defective condition; and that the total sum VSG realized upon liquidation of the goods was $52,970.36 less than the sum of the $250,000 down payment and the expenses it incurred arising out of the shipment. In response, Fashion Shop cited no evidence to the contrary save for an unsupported response: "This statement merely reflects defendant VSG's position and it is not admitted by the Plaintiff."

In response to VSG's motion for a default judgment on the counterclaims, Fashion Shop has neither moved to vacate its default pursuant to Fed. R. Civ. P. 55(c) nor submitted a proposed reply to

27

the counterclaims for the Court's consideration. Fashion Shop's opposition to this aspect of the motion is set forth in the last paragraph of its brief: "the inadvertent non-filing and service of plaintiff's Reply by plaintiff should be excused in view of the complete evidence for plaintiff's prima facie case and the record of the completely disputed sales transaction between the parties."

"A default should not be entered when it would be promptly set aside under Fed. R. Civ. P. Rule 55(c)." GuideOne Speciality Mut. Ins. Co. v. Congregation Bais Yisroel, 381 F. Supp. 2d 267, 281-282 (S.D.N.Y. 2005). "[U]nder Rule 55(c), 'the principal factors bearing on the appropriateness of relieving a party of a default are whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented,'" Id. (quoting Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981)).

Here, Fashion Shop has failed to establish a meritorious defense, which alone is sufficient to deny a motion to vacate a default judgment. See State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada, 246 F. Supp. 2d 231, 237 (S.D.N.Y. 2002), aff'd, 374 F.3d 158 (2d Cir. 2004). VSG is therefore entitled to a default judgment on the counterclaims.

28

## The VSG Motion for Summary Judgment is Granted

New York U.C.C. § 2-601(a) states that "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may . . . reject the whole[.]" VSG rejected the entire shipment, and immediately communicated its rejection in compliance with § 2-602(1), which provides that "[r]ejection of goods must be within a reasonable time after their delivery or tender."

Fashion Shop refused to take back the goods, and failed to return VSG's $250,000 down payment or reimburse it for the expenses incurred, despite being given a more than reasonable time to do so. Pursuant to U.C.C. § 2-711(3), VSG had a security interest in the goods "for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody" and was entitled to "hold such goods and resell them in like manner as an aggrieved seller." There is no evidence that VSG did not resell the goods in a commercially reasonable manner.

VSG had a security interest in the goods in the amount of $335,102.36, but only realized $282,132 upon liquidation, resulting in a net loss to VSG of $52,970.36, all as a result of the delivery

29

of defective and nonconforming goods by Fashion Shop.

Since there are no sums due Fashion Shop from VSG, judgment dismissing the complaint is appropriate.

## Conclusion

Upon the facts and conclusions set forth above, the motions of VSG and Banknorth for summary judgment and the motion of VSG on its counterclaim are granted, the motion of Fashion Shop for summary judgment is denied, and the cross-claims of Banknorth are dismissed.

Submit judgment on notice.

It is so ordered.

**New York, NY**
**November $3 \rho$ , 2007**

**ROBERT W. SWEET**
**U.S.D.J.**

30